430 F.3d 606
 UNITED STATES of America, Appellee,
v.
Frank ESTRADA, also known as "The Terminator," also known as "Big Dog," also known as Frankie Estrada, also known as "Mustard"; Edward Estrada, also known as "French Fry," also known as "Fry"; Isaias Soler, also known as "Eso"; Nelson Carrasquillo; William Rodriguez, also known as Billy Rodriguez, also known as William Gomez, also known as "Billy the Kid"; Charles DeJesus, also known as "Chino"; Eddie Lawhorn, also known as "Fat Boy"; Yamarr Shipman, also known as "Country," also known as "Mar"; Michael Hilliard, also known as "Mizzy"; Rosario Cotto, also known as "Sato"; Pablito Cotto; Benito Rosario; Jermaine Jenkins, also known as "Fats"; Makene Jacobs, also known as "Madee"; Joseph Butler, also known as "Pee Wee"; Viviana Jiminez; Kelvin Vereen, also known as "Nino"; Daniel Herredia, also known as D-Nice; Felipe Santana, also known as "Omar Soto"; Tamarius Maner, also known as "Trigger"; Gloria Vargas; Hector Cruz, also known as "Casper"; Hector Gonzalez, also known as "June Bug"; Enrique Martinez, also known as Ricky Zapata; Carmen Cotto, also known as "CC," Defendants,
Felix DeJesus, also known as "Dino," Ricardo Rosario, also known as "Q," Defendants-Appellants.
 Docket No. 02-1543-CR(L).
 Docket No. 02-1545-CR(XAP).
 Docket No. 02-1626-CR(CON).
 United States Court of Appeals, Second Circuit.
 Argued: September 19, 2005.
 Decided: November 29, 2005.
 
 Dan E. LaBelle, Halloran & Sage, LLP, Westport, CT, for Defendant-Appellant Felix DeJesus.
 Robert J. Sullivan, Westport, CT, for Defendant-Appellant Ricardo Rosario.
 Alex Hernandez, Assistant United States Attorney (Kevin J. O'Connor, United States Attorney for the District of Connecticut, Alina P. Marquez, Jeffrey A. Meyer, Assistant United States Attorneys, on the brief), Bridgeport, CT, for Appellee.
 Before: WINTER, SOTOMAYOR, WESLEY, Circuit Judges.
 SOTOMAYOR, Circuit Judge.
 
 
 1
 Defendants-appellants Felix DeJesus and Ricardo Rosario appeal from judgments entered on September 11, 2002, and October 4, 2002, respectively, in the District Court for the District of Connecticut (Underhill, J.) sentencing DeJesus principally to two concurrent terms of 360 months' imprisonment and Rosario to 240 months' imprisonment. Appellants were convicted after a jury trial of conspiring to possess with intent to distribute, respectively, 1000 grams of heroin and 50 grams of crack cocaine, and 1000 grams of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. In a concurrently filed summary order, we address appellants' challenges to the district court's rulings on a motion to suppress, a number of evidentiary issues, including limitations on cross-examination of cooperating witnesses, a motion under Fed.R.Crim.P. 29, and application of the Sentencing Guidelines. Here, we hold that the public safety exception to the Miranda rule rendered admissible DeJesus's statement that he had a gun in his jacket, made at the time of his arrest in response to a police question that preceded the Miranda warnings. We also hold that a district court's policy of not permitting impeachment of witnesses with the statutory names of a witness's offenses of conviction violates Fed.R.Evid. 609(a)(1) but that the error was harmless in this case.
 
 BACKGROUND
 
 2
 We recite only the facts pertinent to the issues addressed in this opinion.
 
 I. Motion to Suppress
 
 3
 Before trial, DeJesus moved to suppress as the product of an illegal custodial interrogation statements made in his apartment at the time of his arrest on February 5, 1997, before the arresting officers gave him his Miranda warnings, and the gun and narcotics that were seized at that time as a result of the statements. The district court held a suppression hearing on August 21, 2001, and subsequently made the following findings of fact.
 
 
 4
 On February 5, 1997, a five-member team of the Connecticut Fugitive Task Force executed an arrest warrant for DeJesus at an apartment in Bridgeport, Connecticut. The warrant had been issued in connection with two probation violations, and the team was aware of DeJesus's criminal record, which included two assault convictions. DeJesus was already lying face-down on the floor when Sergeant Juan Gonzalez, one of the arresting officers, first saw him. As Gonzalez was standing over and attempting to handcuff him, DeJesus said, in substance, "she's got nothing to do with this" and "I have a gun" or "I got a gun in my pocket," gesturing with his face toward a jacket on a chair. Having handcuffed DeJesus, Gonzalez found a gun and a quantity of heroin in the jacket pocket.
 
 
 5
 At the conclusion of the suppression hearing, the district court denied DeJesus's motion, finding that the evidence had been seized pursuant to a valid search incident to a lawful arrest. The district court did not, however, address DeJesus's claim that the statements indicating the location of the gun should be suppressed pursuant to Miranda, instead treating the motion as having raised only a Fourth Amendment claim.
 
 
 6
 On appeal, the government concedes that DeJesus's statement to Gonzales was made in response to questions posed by another officer without Miranda warnings. The government adopts the testimony of Special Agent Randy Jarvis at the suppression hearing that another officer asked DeJesus, without having given Miranda warnings, whether there were any weapons in the apartment.
 
 II. The Impeachment Rulings
 
 7
 At trial, the government called a number of cooperating witnesses. When defense counsel first proposed impeaching cooperator Jose Lugo with a burglary conviction, the district court judge explained his "general approach," stating that, for "a conviction that goes to credibility, conviction for fraud, that type of thing, then you can bring out the nature of the conviction. If it's simply a felony conviction, the fact of the conviction is I think what you bring out." The district court reasoned that "[t]he fact that it was burglary doesn't seem to have any independent relevance," and therefore limited cross examination on Lugo's burglary conviction to the fact of an unnamed felony conviction. Considering witness Ismael Padilla's larceny convictions, the district court judge indicated that whether larceny is crimen falsi depends on the underlying facts and permitted extended in camera questioning of the witness about his larceny convictions. At the conclusion of this examination, the district court judge stated that he had not "heard an argument for the probative value here unless it is a crime of falsity or deceit that [] goes to ... untruthfulness." The district court judge then indicated that, for crimes not bearing directly on veracity, "it's the fact and presumably the date, if you want to get it in, that goes to credibility, and the credibility of the witness is not further attacked if it's, you know, Crime A versus Crime B." He explained that he was not "aware of any judge in this district that lets in the nature of the conviction rather [than] simply the fact and the date."
 
 
 8
 The court then demonstrated the kind of questions defense counsel could pose: "In June 1992, you were convicted of a felony, right? And in October 1993, you were convicted of another felony." The district court judge reiterated that his approach was "consistent with practice in this district." The district court applied the same analysis to cooperator William Rodriguez's felony drug convictions and his murder conviction, finding none of these convictions to bear on truthfulness. Finally, following extended in camera questioning of witness Joseph Butler, the district court found that Butler's robbery, escape, and manslaughter convictions did not "go to the question of truthfulness or veracity" and limited impeachment for each offense to the fact of an unnamed felony conviction and its date.
 
 DISCUSSION
 I. Public Safety Exception
 
 9
 The district court denied DeJesus's motion to suppress statements and physical evidence, challenged as the product of an illegal custodial interrogation, on the sole ground that the physical evidence was seized pursuant to a valid search incident to a lawful arrest. The district court thus treated DeJesus's motion as stating only a Fourth Amendment claim and did not consider the Fifth Amendment argument raised by DeJesus that the physical evidence was the product of a custodial interrogation not preceded by Miranda warnings. However, "we may affirm the denial of the suppression motion on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely." United States v. Tropiano, 50 F.3d 157, 161 (2d Cir.1995) (citation and internal quotation marks omitted). To the extent that the government addresses DeJesus's Miranda claim on appeal, it does not dispute that the officers questioned DeJesus within the meaning of Miranda before informing him of his rights, but argues that DeJesus's pre-Miranda statements were admissible under the "public safety" exception to the Miranda rule. Where the public safety exception applies, a defendant's statement — and the physical evidence recovered as a result of that statement — may be admitted into evidence at trial. See New York v. Quarles, 467 U.S. 649, 657-60 & n. 9, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).
 
 
 10
 Although statements made by a suspect in custody in response to police interrogation are typically inadmissible unless preceded by Miranda warnings, see Miranda v. Arizona, 384 U.S. 436, 467-68, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court has recognized a "public safety" exception to that rule. Quarles, 467 U.S. at 655-59, 104 S.Ct. 2626. In Quarles, a woman informed the police that she had been raped at gunpoint and that the man, whose appearance she described, had just entered a nearby supermarket. Id. at 651-52, 104 S.Ct. 2626. The police located a man in the supermarket that fit the description and discovered that he was wearing an empty shoulder holster. Id. at 652, 104 S.Ct. 2626. After handcuffing him but before advising him of his Miranda rights, the police asked the man where the gun was. Id. The man responded "the gun is over there," and the police recovered a loaded .38 caliber revolver from an otherwise empty carton in the area to which the defendant had pointed. Id. The Supreme Court reversed the state court's suppression of both the statement and the firearm, holding that there is a "public safety" exception to the requirement that Miranda warnings be given before a suspect's answers to police questions may be admitted into evidence. Id. at 655-56, 104 S.Ct. 2626. The Court cited the danger posed by a gun hidden in a supermarket: an accomplice might make use of it or a member of the public might come upon it. Id. at 657, 104 S.Ct. 2626. The Court characterized its holding as a "narrow exception" to the Miranda rule, indicating that "police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." Id. at 658-59, 104 S.Ct. 2626. We have had relatively few opportunities to address the public safety exception. See United States v. Newton, 369 F.3d 659 (2d Cir.2004); United States v. Reyes, 353 F.3d 148 (2d Cir.2003); United States v. Khalil, 214 F.3d 111 (2d Cir.2000).
 
 
 11
 In Khalil, the appellant raised a limited question for our consideration. In that case, an informant told police that his roommate had bombs in their apartment and planned to detonate them soon in a subway or bus terminal. 214 F.3d at 115. During a raid on the apartment, police officers grappled with two occupants, one of whom crawled toward a black bag the officers believed might contain a bomb. Id. The officers shot and wounded both men, who were then handcuffed and taken to a hospital. After discovering pipe bombs in the bag and observing that a switch on one of the bombs had been flipped, raising a concern that the bombs would detonate before they could be disarmed, officers questioned one of the men at the hospital about the bombs without giving him Miranda warnings. While the officers' first four questions were prompted by the concern that the bombs would explode and elicited information about how they could be disarmed, the final question was not of this nature. Id. The district court ruled that the public safety exception covered all five of the questions and answers. Id. at 121. On appeal, the defendant challenged only the district court's failure to suppress his response to the last question — whether he had intended to kill himself in detonating the bombs — arguing that this question was unrelated to public safety. Id. We reasoned that whether he would survive his attempt to detonate the bomb "had the potential for shedding light on the bomb's stability," concluding, in any event, that the admission of the defendant's response at trial was harmless error at worst. Id.
 
 
 12
 Reyes more closely resembles the instant case. Reyes was arrested following a narcotics sale to a confidential informant and an undercover officer. 353 F.3d at 150. Before the arresting officer handcuffed Reyes or gave him Miranda warnings, he asked Reyes "if he had anything on him that [could] hurt [the officer] or anyone on [the] field team." Id. (alterations in original). After Reyes indicated that he had a gun in his pocket, and the officer removed it, the officer again asked whether Reyes had anything in his pocket that "could hurt" the officer. Id. at 151. Reyes then stated that he had drugs in his car. Id. Before trial, the district court denied Reyes's motion to suppress the physical evidence while granting his motion to suppress the statements. Id. We reversed the district court's suppression of the statements, holding that the public safety exception applied. Id. at 155. We reasoned that because Reyes was a known drug dealer and weapons are tools of the drug trade, the officers had specific information that Reyes routinely carried a firearm, and the arrest took place in the afternoon across the street from a school, there was "a graphic tableau of danger to both the officers and the public," and the arresting officer had an objectively reasonable belief that Reyes had a weapon on his person. Id. at 153-54. Satisfied that the officer's questions were sufficiently limited in scope such that they were not designed to elicit incriminating evidence, id. at 154, we nonetheless acknowledged the risk that "the public safety exception might be distorted into a per se rule as to questioning people in custody on narcotics charges," id. at 155 (citation and internal quotation marks omitted), and emphasized that it could not "become a matter of course to precede every Miranda warning with the questions that were put to Reyes." Id. We reiterated that the purpose of the public safety exception is "to allow officers `to follow their legitimate instincts when confronting situations presenting a danger to the public safety,'" id. (quoting Quarles, 467 U.S. at 659, 104 S.Ct. 2626), noting that "[t]here has to be some flexibility in situations where the safety of the public and the officers are at risk." Id.
 
 
 13
 We considered the public safety exception to the Miranda rule most recently in Newton. There, police officers received a report that a parolee had threatened to kill his mother and his mother's husband, in whose apartment he was staying, and that he kept a gun in a shoe box by the door. 369 F.3d at 663. Arriving at the apartment, the officers roused Newton and handcuffed him without advising him of his Miranda rights, explaining that he was being restrained for his own safety and the safety of the officers. Id. One of the officers then asked whether Newton had any "contraband" in the apartment, and Newton replied "only what is in the box" — a .22 caliber automatic firearm. Id. at 663-64. We held that the question fell within the public safety exception and that Newton's statement was thus properly admitted at trial, reasoning that because the officers knew that Newton possessed a gun and had recently threatened to kill his mother and her husband, they had an objectively reasonable belief that he was dangerous. Id. at 678. Although Newton was in handcuffs when the officer posed the question, we considered the presence of others in the apartment and the hostility of what was a volatile domestic dispute in concluding, even with Newton restrained, that the unlocated gun posed "a deadly risk to everyone on the premises." Id. Finally, we found that while the officer's question about "contraband" could include items not presenting immediate safety concerns, the question plainly encompassed weapons, and the defendant's response indicated that he understood it along those lines. Id. at 679. As a result, we concluded that the question's breadth did not defeat application of the Miranda public safety exception.
 
 
 14
 Our cases addressing the public safety exception distill to three principles. First, we have observed that "Miranda warnings need not precede `questions reasonably prompted by a concern for the public safety' or for the safety of the arresting officers," Reyes, 353 F.3d at 152 (quoting Quarles, 467 U.S. at 656, 104 S.Ct. 2626), "so long as the questioning `relate[s] to an objectively reasonable need to protect the police or the public from any immediate danger.'" Newton, 369 F.3d at 677 (quoting Quarles, 467 U.S. at 659 n. 8, 104 S.Ct. 2626) (alteration in original; emphasis added). While the facts in Quarles raised the specter of danger to the public, the public safety exception clearly encompasses questions necessary to secure the safety of police officers. Quarles, 467 U.S. at 658-59, 104 S.Ct. 2626; see also United States v. Lackey, 334 F.3d 1224, 1227-28 (10th Cir.2003) ("It is irrelevant that the principal danger in this case was the risk of injury to the officers ... rather than ordinary members of the `public.'"). Second, the exception is limited by the fact that pre-Miranda questions, while "framed spontaneously in dangerous situations," Newton, 369 F.3d at 678, may not be investigatory in nature or "designed solely to elicit testimonial evidence from a suspect." Quarles, 467 U.S. at 658-59, 104 S.Ct. 2626. As we acknowledged in Newton, however, a question need not be posed as narrowly as possible, because "[p]recision crafting cannot be expected" in the circumstances of a tense and dangerous arrest. 369 F.3d at 678. Thus, a question that plainly encompasses safety concerns, but is broad enough to elicit other information, does not necessarily prevent application of the public safety exception when safety is at issue and context makes clear that the question primarily involves safety. See id. at 679. Third, we expressly have not condoned the pre-Miranda questioning of suspects as a routine matter. Rather, recognizing the need for "flexibility in situations where the safety of the public and the officers are at risk," Reyes, 353 F.3d at 155, we have described the public safety exception as "`a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case.'" Id. at 152 (quoting United States v. Banks, 540 U.S. 31, 36, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003)).
 
 
 15
 Here, the arresting officers knew that DeJesus had convictions for a misdemeanor and a felony assault.[1] The officers also knew DeJesus to be a drug dealer, testifying at the suppression hearing that "[h]e was well known in the narcotics field" and noting in their affidavit in support of an arrest warrant that he was a target of an investigation into a "major narcotic trafficking operation." A confidential informant had told the officers that DeJesus kept his drugs at the apartment where he was arrested. The arresting officers also knew that a woman received mail at the address, and a woman was present in the apartment at the time of the arrest.
 
 
 16
 In light of these facts, the arresting officers had an objectively reasonable need to protect themselves from immediate danger. The officers had ample reason to fear for their safety. First, considering DeJesus's assault convictions, the officers had reason to believe that DeJesus was capable of violence. Second, the informant's statement that DeJesus kept drugs in the apartment gave rise to a reasonable belief that he also kept a gun there. We have often recognized that firearms are tools of the drug trade that are commonly kept on the premises of major narcotics dealers. See, e.g., Reyes, 353 F.3d at 154. Finally, the fact that another person was present in the apartment at the time of DeJesus's arrest contributed to and compounded the threat the officers faced, making their concern for their safety objectively reasonable.
 
 
 17
 We are also persuaded that the officer's questions whether there were any guns in the apartment were narrow in scope, directly targeting the safety concern, and were not posed to elicit incriminating evidence. Rather, given that the apartment had not been secured at the time of the questioning, the questions were aimed at controlling a potentially dangerous situation and relieving an immediate threat to the officers' safety. There is no suggestion or facts in this case to indicate that the questions were a subterfuge for collecting evidence and were thus investigatory. That the questions elicited a response that led to the discovery of drugs in DeJesus's jacket pocket with the gun does not render the public safety exception inapplicable. The focused questions posed little risk of eliciting non-responsive, incriminating answers and, in fact, did not elicit any such answers. That DeJesus had drugs in his jacket with the gun was mere happenstance. Moreover, the physical evidence discovered following DeJesus's response to the non-investigatory questions likely would have been produced in any event by a search of the jacket, which the officers used to cloak DeJesus while transporting him to the police department.
 
 
 18
 On the facts presented here, the officer's questions were prompted by an objectively reasonable need to protect the arresting officers from danger, and the discovery of the narcotics was merely incidental to recovering the gun. We therefore hold that the Quarles public safety exception applies to the facts presented here and that, as a result, DeJesus's statements, the gun, and the drugs were properly admitted as evidence at trial. Cf. United States v. Edwards, 885 F.2d 377, 384 & n. 4 (7th Cir.1989) (applying public safety exception where police officer asked a suspected drug dealer whether he was armed because "drug dealers are known to arm themselves" and the officers had an "objectively reasonable need" to protect themselves). We reiterate, however, that the exception must not "be distorted into a per se rule as to questioning people in custody on narcotics charges," Reyes, 353 F.3d at 155 (citation and internal quotation marks omitted), and emphasize that the exception will apply only where there are sufficient indicia supporting an objectively reasonable need to protect the police or the public from immediate harm.
 
 
 19
 II. Scope of Impeachment under Fed.R.Evid. 609
 
 
 20
 DeJesus claims that the district court's decision to limit the scope of impeachment of the government's witnesses, as a matter of policy, to the fact and date of their felony convictions without permitting inquiry into the statutory names of their offenses of conviction violated the Confrontation Clause and Fed.R.Evid. 609. DeJesus also claims that the district court erred by characterizing Ismael Padilla's larceny convictions as subject to Rule 609(a)(1) rather than as crimen falsi automatically admissible under Rule 609(a)(2). We reject appellant's contention that the district court misapplied Rule 609(a)(2) as to Padilla's larceny convictions. We agree with appellant, however, that the district court misapplied Rule 609(a)(1) — although we do not believe that the district court's ruling violated the Confrontation Clause — by limiting impeachment to the mere fact of an unnamed felony conviction, but we find the error in this case to be harmless.
 
 A. Application of Rule 609(a)(2)
 
 21
 We first address DeJesus's claim that Padilla's larceny convictions constitute crimes of dishonesty that are automatically admissible for impeachment purposes under Rule 609(a)(2), which provides that "evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment." Fed.R.Evid. 609(a)(2). With respect to convictions for larceny, we have held that "we will look beyond the elements of the offense to determine whether the conviction rested upon facts establishing dishonesty or false statement." United States v. Payton, 159 F.3d 49, 57 (2d Cir.1998). In Payton, this Court found that the witness's larceny conviction qualified as a Rule 609(a)(2) crime, involving dishonesty and false statement, because she had unlawfully received food stamps after falsely stating in a sworn application that she qualified for welfare. Id. In the instant case, by contrast, defense counsel established outside of the presence of the jury that Padilla had several larceny convictions for shoplifting and that he had taken elusive action to avoid detection. The district court did not err, having looked beyond the elements of the offense to the underlying facts, in determining that the circumstances of Padilla's larceny convictions did not involve falsity or deceit such as to fall within the ambit of Rule 609(a)(2). See United States v. Hayes, 553 F.2d 824, 827 (2d Cir.1977) (noting that "crimes of force, such as armed robbery or assault, or crimes of stealth, such as burglary or petit larceny, do not come within" Rule 609(a)(2) (internal citations omitted)); cf. United States v. Sellers, 906 F.2d 597, 603 (11th Cir.1990) ("[C]rimes such as theft, robbery, or shoplifting do not involve `dishonesty or false statement' within the meaning of Rule 609(a)(2)."). While much successful crime involves some quantum of stealth, all such conduct does not, as a result, constitute crime of dishonesty or false statement for purposes of Rule 609(a)(2). See Hayes, 553 F.2d at 827 (stating that Congress limited the crimes covered by Rule 609(a)(2) because of the Rule's inflexibility and noting that a conviction that "involved nothing more than stealth" could not be introduced automatically under Rule 609(a)(2)); cf. United States v. Brackeen, 969 F.2d 827, 829-30 (9th Cir.1992) (en banc) (distinguishing between the broad meaning of "dishonesty" as a lack of integrity or principles and its narrow meaning under Rule 609(a)(2) as a disposition to deceive). The district court thus did not abuse its discretion in treating Padilla's larceny convictions as Rule 609(a)(1) crimes rather than as crimen falsi automatically admissible under Rule 609(a)(2).
 
 
 22
 B. Scope of Cross-Examination under Rule 609(a)(1) and the Confrontation Clause
 
 
 23
 The district court misapplied Rule 609(a)(1) by limiting the scope of impeachment of the government's witnesses, as a matter of policy, to the fact and date of their felony convictions without permitting inquiry into the statutory names of the witnesses' offenses of conviction. The court, however, did not violate the Confrontation Clause by restricting cross-examination in this manner.
 
 
 24
 This Court begins its de novo review of whether Rule 609(a)(1) requires district courts to admit evidence of the statutory names of a witness's offenses of conviction by looking at the language and structure of the rule. Cf. United States v. Orlandez-Gamboa, 320 F.3d 328, 330 (2d Cir.2003) (reviewing district court's interpretation of Fed.R.Evid. 410 de novo). The Rule states that "evidence that a witness ... has been convicted of a crime shall be admitted, subject to Rule 403." Fed.R.Evid. 609(a)(1) (emphasis added). The question raised by the district court's interpretation of the Rule is thus whether the "evidence" of a prior felony conviction referenced in the Rule necessarily includes the statutory name of the offense and any other information, or whether the mere fact of conviction of an unnamed felony, the sentence imposed, and the date of conviction suffice.
 
 
 25
 Both Rule 609(a)(1) and (a)(2) contemplate admitting "evidence" of a witness's convictions for impeachment purposes.[2] The language of both provisions is identical with respect to the generalized description of the "evidence" of a witness's convictions that is to be admitted. The presumption under Rule 609(a)(2) — as recognized by the district court — is that the "essential facts" of a witness's convictions, including the statutory name of each offense, the date of conviction, and the sentence imposed, are included within the "evidence" that is to be admitted for impeachment purposes. See 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 609.20[2] at 609-57 (2d ed.2005). We see no reason why the presumption should be different under Rule 609(a)(1). The only difference between the two provisions is that evidence of convictions for crimes involving "dishonesty or false statement," whether felonies or misdemeanors, must be admitted under Rule 609(a)(2) as being per se probative of credibility, while district courts, under Rule 609(a)(1), may admit evidence of a witness's felony convictions that do not constitute crimen falsi, subject to balancing pursuant to Rule 403.[3] See Fed.R.Evid. 609 Advisory Committee's Note (1974) ("The admission of prior convictions involving dishonesty and false statement is not within the discretion of the court. Such convictions are peculiarly probative of credibility and, under this rule, are always to be admitted."). We see nothing in this distinction between the two provisions that would justify the conclusion that the "evidence" of a witness's convictions contemplated by Rule 609(a)(1) is automatically more circumscribed than the evidence that is automatically admissible under Rule 609(a)(2).
 
 
 26
 The overwhelming weight of authority supports this conclusion and suggests that, while it may be proper to limit, under Rule 609(a)(1), evidence of the underlying facts or details of a crime of which a witness was convicted, inquiry into the "essential facts" of the conviction, including the nature or statutory name of each offense, its date, and the sentence imposed is presumptively required by the Rule, subject to balancing under Rule 403. See United States v. Howell, 285 F.3d 1263, 1267-68 (10th Cir.2002) (finding that evidence of the number and nature of felony offenses is ordinarily required under Rule 609(a)(1) because a witness's convictions bear to differing degrees on credibility depending on these characteristics); United States v. Burston, 159 F.3d 1328, 1335-36 (11th Cir.1998) (holding that the probative value of prior felony convictions varies with their nature and number); Campbell v. Greer, 831 F.2d 700, 707 (7th Cir.1987) (concluding in a civil case that the "crime must be named" because the jury cannot evaluate a witness's credibility "if all it is told is that the witness was convicted of a `felony'"); 28 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6134, at 224 (1993) (stating that the "mere fact" approach, under which only the fact of a felony conviction is admitted, is difficult "to justify with the language and structure of Rule 609"); 4 WEINSTEIN & BERGER § 609.20[2] at 609-57 to 60 (stating that the impeaching party is usually limited to establishing the name of the offense, the date of conviction, and the sentence, and that it may be improper "to limit impeachment to the mere fact of a prior conviction, without allowing the impeaching party to specify the nature and number of offenses involved"); cf. CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, EVIDENCE § 6.31 at 562-64 (2d ed.1999) (discussing the relevance of the nature of a non-Rule 609(a)(2) felony to the jury's assessment of a witness's credibility).
 
 
 27
 This interpretation of Rule 609 is consistent with both the Rule's structure and the insight that different felonies, even those that do not constitute crimen falsi, bear on credibility to varying degrees. District courts must thus undertake an individualized balancing analysis under Rule 609(a)(1) before excluding evidence of the statutory name of a witness's crime. Applying a generalized heuristic is simply improper. In short, the balancing requirement incorporated into Rule 609(a)(1) presumes that some details of a witness's felony convictions will be considered. See United States v. Figueroa, 618 F.2d 934, 943 (2d Cir.1980) (finding that the 1974 version of Rule 609(a)(1) required district courts to assess probative value against prejudicial effect before admitting evidence of a defendant's prior convictions for impeachment purposes). In conformity with Rule 403, unless the risk of unfair prejudice, confusion, or delay substantially outweighs the probative value of a felony conviction, it is the jury's function to assess the probative value of a witness's specific conviction or convictions as part of its overall evaluation of the witness's credibility. This approach is consistent with this Court's acknowledgment in United States v. Ortiz, 553 F.2d 782 (2d Cir.1977), in which we considered the admissibility of an accused's prior convictions under the originally enacted Rule, that many factors are relevant to a district court's exercise of discretion under Rule 609(a)(1), "[p]rime among them [being] whether the crime, by its nature, is probative of a lack of veracity." Id. at 784. Rule 609(a)(1) thus contemplates that district courts will admit evidence of the nature of a witness's prior felony convictions, including the statutory name of the offense, the date of conviction, and the sentence imposed, subject to Rule 403.
 
 
 28
 District courts, in applying Rule 609(a)(1), are thus required to examine which of a witness's crimes have elements relevant to veracity and honesty and which do not. Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully. See United States v. Lipscomb, 702 F.2d 1049, 1062 (D.C.Cir.1983) (en banc) (concluding that Congress believed that all felonies have some probative value on the issue of credibility). District courts under Rule 609(a)(1) are to consider the relative probative worth of a witness's specific offenses of conviction, however, in light of the factors listed under Rule 403, when determining whether to admit evidence of those convictions for impeachment purposes. See Howell, 285 F.3d at 1270 (noting that "[a]fter conducting the Rule 403 balancing, the court may determine that evidence of the conviction, or certain aspects of evidence of the conviction, are properly excluded.").
 
 
 29
 When performing the Rule 403 analysis under Rule 609(a)(1), district courts are admonished to consider that Rule 609(a)(1) crimes, which do not bear directly on honesty such as to be automatically admissible under Rule 609(a)(2), may nonetheless be highly probative of credibility. See Hayes, 553 F.2d at 828 ("If a conviction may not be automatically admitted under the second prong, ... it may still be admitted in the court's discretion if it meets the criteria of the first."). We believe that felonies not involving dishonesty or false statement such as to fall within the scope of Rule 609(a)(2) nonetheless bear on credibility to varying degrees. See 4 WEINSTEIN & BERGER § 609.05[3][b] at 609-39 ("Although Rule 609(a)(1) addresses convictions for crimes that do not involve dishonesty or false statement, some felonies are more related to veracity than are others."). We agree, therefore, with those of our sister circuits that have reasoned that all Rule 609(a)(1) felonies are not equally probative of credibility but that many are significantly probative of a witness's propensity for truthfulness. See Howell, 285 F.3d at 1268; Burston, 159 F.3d at 1335; Campbell, 831 F.2d at 707.
 
 
 30
 An influential case from the Court of Appeals for the District of Columbia that pre-dates the Federal Rules distinguished between crimes that reflect adversely on a person's integrity, and which therefore bear on honesty — such as those involving deceit, fraud, and theft — and acts of violence, "which may result from a short temper, a combative nature, extreme provocation, or other causes, [and] generally have little or no direct bearing on honesty and veracity." Gordon v. United States, 383 F.2d 936, 940 (D.C.Cir.1967). The Gordon court thus stated a "rule of thumb" to be that "convictions which rest on dishonest conduct relate to credibility whereas those of violent or assaultive crimes generally do not." Id.; see also 28 WRIGHT & GOLD § 6134 at 233 ("[C]rimes of impulse or carelessness have little probative value since they say little about the propensity to engage in calculated law-breaking like perjury."); 4 WEINSTEIN & BERGER § 609.05[3][b] at 609-39 and 40 (noting that "crimes of violence generally have limited probative value concerning the witness's credibility" and that theft "crimes have greater impeachment value"). We find the distinction enunciated in Gordon to have substantial analytic value. While many felonies exemplifying untruthful behavior fall within the ambit of Rule 609(a)(2), many crimes that do not fit that provision are nonetheless quite probative of veracity.
 
 
 31
 This distinction between crimes falling outside Rule 609(a)(2) but nonetheless ranking high on the scale of probative worth on credibility, including, for example, theft and escape crimes, and those ranking low on that scale, including crimes of violence, appears in cases from numerous jurisdictions. See Hayes, 553 F.2d at 828 (discussing crimes "that rank[] relatively high on the scale of veracity-related crimes, although not so high as to fall clearly within the second prong of Rule 609(a)") (internal citation omitted); MUELLER & KIRKPATRICK § 6.31 at 563. "Similarly high on the scale are crimes that involve evasions of responsibility or abuse of trust, a category that includes smuggling or failure to register or report when required, and at least sometimes drug importation and even sexual abuse of children in [the witness's] care." MUELLER & KIRKPATRICK § 6.31 at 563. Many drug crimes and crimes involving public morality, such as prostitution, may be less probative of veracity. Id. We hasten to add, however, that "crimes requiring planning or preparation bear more strongly on veracity than violence alone suggests because planning indicates deliberate and injurious violation of basic standards rather than impulse or anger, and usually it involves some element of deceiving the victim." Id. at 563-64; see also 28 WRIGHT & GOLD § 6134 at 233 ("[V]iolent crimes involving ... premeditation are relatively higher in probative value because they suggest the witness is willing to break the law when it furthers his interests."). We also note that the gravity of an offense may bear on truthfulness, to the extent that more serious offenses indicate a stronger willingness to ignore the law. MUELLER & KIRKPATRICK § 6.31 at 564. But see 28 WRIGHT & GOLD § 6134 at 232-33 (noting that for "particularly depraved and offensive acts, such as wanton violence or sexual immorality, the jury is likely to draw the prejudicial inference that the witness is a bad person while at the same time the jury may derive little probative value from the conviction since these crimes say little about credibility" while acknowledging that particularly heinous crimes may be high in probative value insofar as they reflect a rejection of social mores).
 
 
 32
 In light of the foregoing, we agree with the observation, about an earlier iteration of Rule 609, that "[i]t is implausible that Congress believed that crimes falling on one side of the [Rule 609(a)] line are so probative of credibility that they should be admitted regardless of prejudice but that crimes falling just on the other side of the line may in some cases not be probative at all." Lipscomb, 702 F.2d at 1057. We find equally persuasive the point that "[m]ore likely, Congress anticipated that crimes of stealth (e.g., smuggling, burglary), while not quite crimes of `dishonesty or false statement,' do reflect lack of credibility and should be admitted unless significantly prejudicial." Id. We thus find the gradations among Rule 609(a)(1) crimes, in terms of their bearing on truthfulness, to lie at the heart of the Rule 403 analysis that district courts must undertake when determining whether to admit for impeachment purposes evidence of a witness's convictions, including their statutory names, under Rule 609(a)(1).
 
 
 33
 We also emphasize that district courts should consider, when undertaking the balancing analysis under Rule 609(a)(1), whether the witness is testifying for the defendant or the government. As originally enacted in 1974, Rule 609(a)(1) provided for weighing the prejudicial effect against the probative value of a witness's conviction only with respect to the defendant and thus required evidence of a witness's prior felony convictions to be admitted for impeachment purposes if there was no harm to the defendant.[4] Fed.R.Evid. Advisory Committee's Note (1974) ("The danger of prejudice to a witness other than the defendant (such as injury to the witness' reputation in his community) was considered and rejected by the Conference as an element to be weighed in determining admissibility. It was the judgment of the Conference that the danger of prejudice to a nondefendant witness is outweighed by the need for the trier of fact to have as much relevant evidence on the issue of credibility as possible."). The 1990 amendments changed the Rule, "reflect[ing] the view that it is desirable to protect all litigants from the unfair use of prior convictions, and that the ordinary balancing test of Rule 403 ... is appropriate for assessing the admissibility of prior convictions for impeachment of any witness other than a criminal defendant." Fed.R.Evid. Advisory Committee's Note (1990).
 
 
 34
 The 1990 amendments thus rejected the view that Rule 609(a) gives no protection for government witnesses, and the Advisory Committee stated that
 
 
 35
 [t]here are cases in which impeachment of government witnesses with prior convictions that have little, if anything, to do with credibility may result in unfair prejudice to the government's interest in a fair trial and unnecessary embarrassment to a witness.
 
 
 36
 Fed.R.Evid. 609 Advisory Committee's Note (1990). The Advisory Committee noted, however, that "[t]he probability that prior convictions of an ordinary government witness will be unduly prejudicial is low in most criminal cases. Since the behavior of the witness is not the issue in dispute in most cases, there is little chance that the trier of fact will misuse the convictions offered as impeachment evidence as propensity evidence." Id. The Committee went on to note that
 
 
 37
 trial courts will be skeptical when the government objects to impeachment of its witnesses with prior convictions. Only when the government is able to point to a real danger of prejudice that is sufficient to outweigh substantially the probative value of the conviction for impeachment purposes will the conviction be excluded.
 
 
 38
 Id.; cf. 28 WRIGHT & GOLD § 6134 at 244-45 ("[W]here conviction evidence is offered against a witness other than the accused, the balance usually should be struck in favor of admissibility.... [W]here an accused offers conviction evidence to impeach a prosecution witness, ... courts weighing probative value against prejudice usually should err on the side of admitting the evidence.") Thus,
 
 
 39
 although the proponent of the admission of evidence of a prior conviction is the accused who seeks to impeach the government witnesses, the government bears the burden of protecting its witnesses from such impeachment by demonstrating to the court, pursuant to Rule 403's exclusionary rule, that the probative value of the conviction at issue is substantially outweighed by the danger of unfair prejudice, or the other grounds for exclusion noted in Rule 403.
 
 
 40
 United States v. Tse, 375 F.3d 148, 162 (1st Cir.2004).
 
 
 41
 The Advisory Committee notes make clear that while the prior convictions of a government witness are unlikely to inflame the jury or invite a propensity inference, they may cause unfair prejudice to the government's interest in a fair trial or unnecessary embarrassment to the witness. While these are important concerns, the notes emphasize that impeachment evidence relating to a government witness should be excluded under Rule 609(a)(1) only when there is a real danger that such prejudice substantially outweighs the probative value of a witness's felony convictions as they relate to his or her propensity for truthfulness. We add one caveat, noting that the impeachment of cooperating witnesses with crimes committed in furtherance of the same conspiracy with which a defendant is charged may result in prejudice to the defendant and, under all circumstances, that prejudice must be carefully considered in the Rule 403 balance.
 
 
 42
 Here, by following a policy that presumptively excluded the statutory names of the cooperating witnesses' Rule 609(a)(1) convictions, the district court essentially applied a per se rule that all felony convictions not determined to be crimen falsi for purposes of Rule 609(a)(2) are equally probative of credibility. By permitting to go before the jury only evidence of an aseptic, unnamed "felony" conviction for Rule 609(a)(1) crimes of which government witnesses had been convicted, the district court acknowledged the generic probative value of felony convictions. By interpreting the Rule to require nothing more, however, the district court failed to undertake the balancing prescribed by the Rule, which requires assessment of the probative value of a particular conviction on a witness's propensity for truthfulness in light of the risk of prejudice, confusion, and delay. Rather, the district court short-circuited the balancing prescribed by the Rule, determining first whether a crime fell under Rule 609(a)(1) or (a)(2) and, if the former, foreclosing the typical Rule 403 analysis by admitting evidence only of an unnamed felony.
 
 
 43
 Equally important, the district court's approach implicitly determined that it would not exclude evidence of prior felony convictions under Rule 609(a)(1). While the district court indicated that the fact of a witness's felony convictions was admissible under Rule 609(a)(1) "unless there is a 403 balancing problem," it obviated the need for such balancing by scrubbing the convictions of any factors that would be relevant to a Rule 403 analysis. The Rule requires district courts to admit the name of a conviction, its date, and the sentence imposed unless the district court determines that the probative value of that evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. This determination is left to the sound discretion of the district court. See United States v. Ansaldi, 372 F.3d 118, 131 (2d Cir.2004) (noting that a district court's balancing under Rule 403 "will not be disturbed unless there is a clear showing of abuse of discretion"); United States v. Washington, 746 F.2d 104, 106 (2d Cir.1984) (noting that the balancing under Rule 609(a)(1) is left to the discretion of the trial judge). What is crucial is that the district court perform the Rule 403 analysis with respect to the essential facts of conviction and admit or exclude the evidence, rather than merely determining whether a crime falls under Rule 609(a)(1) or (a)(2) before applying a general rule as a matter of policy.
 
 
 44
 Thus, evidence of the witness Padilla's larceny convictions, for example, including the statutory name, date of conviction, and sentence imposed, perhaps should have been admitted under Rule 609(a)(1) if any of them were felonies. While not crimen falsi that are automatically admissible under Rule 609(a)(2), theft crimes, and other crimes involving stealth, nonetheless bear on a witness's propensity to testify truthfully. The district court may have been justified, by contrast, had it refused to permit the defendant to impeach government witnesses with crimes of violence, which may bear so marginally on honesty or veracity, depending on the circumstances of those crimes, as to justify exclusion under Rule 609(a)(1). We reiterate, however, that district courts must be skeptical when the government objects to impeachment of its witnesses with prior felony convictions and should be reticent to limit such impeachment in the absence of a demonstrable danger of prejudice to the government's interest in a fair trial.
 
 
 45
 Although the district court erroneously applied Rule 609(a)(1), its limitation on cross-examination did not deprive DeJesus of his right to confront the witnesses against him under the Sixth Amendment. This Court has noted that "while the right to cross-examination is not absolute, it is effectively denied when a defendant is prohibited from `expos[ing] to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.'" Howard v. Walker, 406 F.3d 114, 129 (2d Cir.2005) (alteration in original) (quoting Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). The Supreme Court, interpreting Davis, has found a Confrontation Clause violation where "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [] counsel been permitted to pursue his proposed line of cross-examination." Delaware v. Van Arsdall, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).
 
 
 46
 In the instant case, the district court permitted DeJesus to present substantial evidence bearing on the prosecution witnesses' credibility. The district court permitted him to cross-examine the witnesses about their cooperation agreements as well as to adduce evidence of their criminal records. For example, the prosecutor elicited on direct examination the fact that Lugo was convicted of a felony offense in 1991 for which he was sentenced to seven years' incarceration and was subsequently sentenced to eighteen years' imprisonment on a 1998 felony narcotics conviction. The prosecutor also elicited testimony about, and defense counsel cross-examined Lugo on, his cooperation agreement. With respect to cooperator Padilla, the prosecutor elicited that he had "several felony convictions," that he was currently in state custody, and that he faced several pending felony charges. Defense counsel examined Padilla about the chronology of his felony convictions, questioned him about a probation violation, and enquired about his letter offer to the prosecutor to cooperate in this case. The prosecutor and defense counsel similarly questioned Rodriguez about his felony convictions, including his guilty plea to a capital murder charge. Defense counsel also examined cooperator Butler about his three felony convictions and the fact that he had served a seven-year term of incarceration in state prison. Butler was further questioned about the benefits he hoped to gain from his cooperation in this case. Finally, defense counsel elicited that Estrada had served five years in state prison on a felony conviction and that he had bribed corrections officers in prison and police officers on the street. Counsel also elicited testimony that Estrada had ordered the execution of a witness in another case, that he had smuggled heroin into prison, and that he had hired an attorney to represent a co-conspirator so that she would not make statements to law enforcement officers. Estrada also testified that he had agreed to cooperate in this case in part so that his sister would not be charged with murder.
 
 
 47
 In light of the significant evidence bearing on the cooperating witnesses' credibility that was presented to the jury, the marginal impact of evidence relating to the cooperating witnesses' specific offenses of conviction could not have given a reasonable jury a significantly different impression of the witnesses' credibility. The district court's limitation on cross-examination of the prosecution witnesses thus did not constitute a violation of the Confrontation Clause.
 
 C. Harmless Error
 
 48
 DeJesus argues that the district court committed constitutional error in limiting his cross-examination of the prosecution witnesses. DeJesus has not established a violation of the Confrontation Clause, however, and the district court's evidentiary error in excluding evidence of the statutory names of the witnesses' felony offenses under Rule 609(a)(1) was harmless.
 
 
 49
 Because the district court erred in its application of an evidentiary rule, and not in violation of the Confrontation Clause, we apply the harmless error standard enunciated in Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (establishing standard to be applied as whether the error "had substantial and injurious effect or influence in determining the jury's verdict"), and not the harmless error standard applicable to constitutional errors established in Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (stating that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"). This Court considers the erroneous admission or exclusion of evidence to be harmless "if there is `fair assurance' that the jury's `judgment was not substantially swayed by the error.'" United States v. Yousef, 327 F.3d 56, 121 (2d Cir.2003) (quoting Kotteakos, 328 U.S. at 765, 66 S.Ct. 1239). Other Courts of Appeals have found error in a district court's application of Rule 609 to be harmless "if the witness' credibility was sufficiently impeached by other evidence, or if the Government's case was strong enough to support a conviction even apart from the witness' testimony." Burston, 159 F.3d at 1336; see also Howell, 285 F.3d at 1270-71.
 
 
 50
 Here, as stated above, the district court permitted DeJesus to cross-examine the prosecution witnesses about their cooperation agreements, including the circumstances under which they offered to cooperate and the benefits they hoped to gain. The district court also permitted DeJesus to adduce evidence about the cooperators' criminal records. Counsel elicited testimony about the dates of the witnesses' convictions as well as the sentences imposed. Counsel even questioned Rodriguez about his guilty plea to a capital murder charge and Estrada about ordering the execution of a witness in an unrelated case. The witnesses' credibility was thus sufficiently impeached. Moreover, the government's case was strong enough to support DeJesus's conviction even apart from the testimony of Frank Estrada, Jose Lugo, Joseph Butler, William Rodriguez, and Ismael Padilla, the witnesses whose prior felony convictions were admitted for impeachment purposes only as unnamed felonies. Numerous other witnesses, whose testimony is not challenged on appeal, testified about appellant's role and participation in the Estrada narcotics organization. For example, Jermaine Jenkins identified DeJesus as a lieutenant in the Estrada organization who distributed narcotics to street-level sellers. Hector Cruz also identified DeJesus as having sold drugs as part of the Estrada organization. Yamarr Shipman testified that DeJesus supplied street-level sellers with crack. Finally, Sergeant Juan Gonzalez testified that he seized packaged heroin and a firearm from DeJesus's jacket at the time of his arrest. These witnesses, and others, provided overwhelming evidence of DeJesus's participation in the charged conspiracies. The district court's evidentiary error was therefore harmless.
 
 CONCLUSION
 
 51
 For the foregoing reasons and those stated in the accompanying summary order, the judgments of conviction of the district court are AFFIRMED, and the case is REMANDED for proceedings consistent with United States v. Crosby, 397 F.3d 103 (2d Cir.2005), this opinion, and the accompanying summary order.
 
 
 
 Notes:
 
 
 [1]
 Under Connecticut law, a misdemeanor assault involves causing intentional physical injury, reckless serious physical injury, or criminally negligent physical injury involving a deadly weapon or dangerous instrument. C.G.S.A. § 53a-61. Felony assaults are governed by C.G.S.A. §§ 53a-59 and 53a-60. Assault in the second degree, a Class D felony, involves causing intentional serious physical injury, intentional physical injury with a deadly weapon or dangerous instrument, reckless serious physical injury with a deadly weapon or dangerous instrument, non-consensual stupor or unconsciousness through the administration of a drug, or injury to a member or employee of the Board of Pardons and Paroles. C.G.S.A. § 53a-60
 
 
 [2]
 Rule 609 states, in pertinent part:
 (a) General Rule. For the purpose of attacking the credibility of a witness,
 (1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and
 (2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of punishment.
 
 
 [3]
 In defining "dishonesty or false statement" for purposes of Rule 609(a)(2), the Conference Report on the Federal Rules emphasized that it was referring to convictions "peculiarly probative of credibility," such as those for "perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense, or any other offense in the nature of crimen falsi, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on [a witness's] propensity to testify truthfully." H.R. Conf. Rep. No. 93-1597, 2d Sess., at 9 (1974),reprinted in 1974 U.S.C.C.A.N. 7098, 7103.
 
 
 [4]
 The originally enacted rule read, in pertinent part:
 For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of punishment.